Filed 6/22/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>PHONG THANH HUYNH,<br><br>　　Defendant and Appellant. | D076559<br><br><br><br>(Super. Ct. No. SCD250551) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Reversed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers, Christopher Beesley and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

This is the second appeal in this case involving defendant Phong Thanh Huynh.  In our previous decision, we reversed defendant's conviction in *People v. Huynh* (Feb. 24, 2017, D067777) [nonpub. opn.] (*Huynh I*).  Defendant was retried on the same charges in 2019.  The jury found him

guilty of murdering Nghia Pham by means of discharging a firearm from a moving vehicle (Pen. Code,[1] §§ 187, subd. (a) & 189), and found true that defendant personally discharged a firearm during the commission of this offense, causing death (§ 12022.53, subd. (d)).  On September 13, 2019, the court sentenced defendant to a term of 25-years-to life in prison for the murder, and a consecutive term of 25-years-to-life for the enhancement of discharging a firearm.

On appeal, defendant contends the court erroneously admitted evidence that he was a member and the leader of, or had authority in, a gang called Thien Dang.  He asserts the gang evidence was not relevant because Thien Dang was not a criminal street gang.  Further, he contends that there was no evidence that criminal activity was a primary activity of Thien Dang or any member of Thien Dang had ever committed any crime; and that Thien Dang was merely a group of Vietnamese men who gathered to drink, eat, and socialize.

Defendant's central position is that identifying Thien Dang as a street gang was highly inflammatory and the error was compounded by a hypothetical question posed to the People's gang expert.  As we explain, we agree with defendant.  Reversed.

---

[1]     Further statutory references are to the Penal Code unless otherwise specified.

## FACTUAL BACKGROUND[2]

On or about February 5, 2000, 16-year-old Pham was at the Luc Huyen Cam pool hall in East San Diego (pool hall), with 20-year-old Huy Lai, Tien Thanh Nguyen, and 18-year-old Thuy Nguyen. Lai, Tien Thanh Nguyen, and Thuy Nguyen were documented members of the V-Boys criminal street gang.[3]

Another group at the pool hall was composed of Long Tran, Bao Huynh, and Bao's younger brother Tai Huynh. Neither of these three individuals nor Pham were associated with any criminal street gang.

Another individual in the pool hall, Calvin An Le, was a documented member of the Asian Warrior criminal street gang in San Jose. Le and a fellow Asian Warrior member had come to San Diego to avoid being arrested for a shooting committed in San Jose.

While playing pool, Pham accidentally bumped into Bao Huynh or hit him with his cue stick. He apologized and Bao Huynh accepted his apology. When Pham hit Bao Huynh a second time, Bao Huynh walked up to Thuy Nguyen and blew smoke in his face. Thuy Nguyen in response punched Bao Huynh. The two groups of men started fighting. Lai, Bao Huynh and Le were injured in the scuffle.

Bao Huynh received the most serious injuries from the fight. Tai Huynh took his older brother to the hospital for a head injury, where he received stitches. Tai Huynh said his brother had been "beat up really bad."

---

[2]    This summary is primarily derived from *Huynh I*, *supra*, D067777.

[3]    Because many of the individuals share the same last names, we will refer to them using their full names where necessary to avoid confusion.

3

Le's hand was injured and possibly broken. Defendant, who was in the cafe section of the pool hall, saw the fight but was not involved.

Either that night, or a few days later, Tien Thanh Nguyen drove Thuy Nguyen and Pham to a coffee shop located in the San Diego Vietnamese community. Bao Huynh, Tai Huynh, and Long Tran were in the coffee shop parking lot. Bao Huynh's group went over to Tien Thanh Nguyen's car and repeatedly kicked and dented it. In response, Tien Thanh Nguyen and Thuy Nguyen grabbed machetes from Tien Nguyen's car and chased away the men from Bao Huynh's group.

*Pham Murder*

Several days after the machete incident, defendant was at a party on Van Dyke Street in East San Diego with his friends including Long Tran, Bao Huynh, Tai Huynh, and Quan Nguyen. Quan Nguyen was a close friend of Bao Huynh and Tai Huynh. He also was somewhat friendly with defendant.

Defendant asked Quan Nguyen to drive him to watch street racing in Mira Mesa. When they could not find any racing, defendant asked Quan Nguyen to drive him to the house of "Angel," Lai's girlfriend. Angel had been at the pool hall with Lai and had to be home by her curfew. Lai was still playing pool so he asked Pham to take her home in his car.

Although Quan Nguyen had been to Angel's home many times before, defendant had never been there. Quan Nguyen parked by Angel's house. Within minutes of parking outside Angel's house, a car drove up. Angel got out of the car and Pham got into the driver's seat. As she exited the car Angel saw a car parked across the street with its headlights on. Pham, now driving Lai's car, headed back to the pool hall. Defendant instructed Quan Nguyen to follow Lai's car.

At speeds of 60 to 65 miles per hour, Quan Nguyen and defendant followed Pham south on I-15. Just past the split with the 163 freeway, defendant told Quan Nguyen to change lanes and drive up next to the car Pham was driving. Quan Nguyen accelerated and pulled alongside the other car. Defendant pulled out a semiautomatic gun, rolled down his window and shot directly into the driver's side window of the car, shattering the glass. Defendant fired two or three more shots while Quan Nguyen slowed down. Defendant told Quan Nguyen to speed up and fired at least three more times at the car as Quan Nguyen drove past it. Quan Nguyen saw in his rearview mirror that Lai's car slowed, veered to the right, and ran into a guardrail.

At defendant's direction, Quan Nguyen took the next freeway exit. Defendant told Quan Nguyen not to tell anyone about the shooting. Quan Nguyen drove to his apartment where defendant got out and ran across the parking lot to a car that had been parked behind them at Angel's house. Long Tran got out of the second car, made a short phone call from Quan Nguyen's apartment, and left. The next day defendant again warned Quan Nguyen not to tell anyone about the shooting. Quan Nguyen felt threatened and afraid.

Pham was dead by the time paramedics transported him to a trauma center. He was shot in the head with a .380 caliber bullet. A pathologist stated that Pham would have immediately lost consciousness. Seven .380-caliber shell casings were found on the freeway where Pham had been shot. All had been fired from the same firearm. A bullet recovered from Pham's head matched a bullet recovered from the driver-side door panel.

A few weeks later, defendant and Quy Tran were at a restaurant when Tien Thanh Nguyen and two others entered. Defendant told Quy Tran that Lai and Tien Thanh Nguyen were the men who had beat up his cousin,

5

meaning Bao Huynh. Defendant walked up to Tien Thanh Nguyen and angrily said something to the effect of "[Y]ou was the one who was chasing me with the knife or whatever, over at Giot Dang coffee shop. So whoever chasing me over there, I gotta kill them," "One down, one to go," and "You're going to be the next victim." The owner of the restaurant told Tien Thanh Nguyen and Lai to leave the restaurant or he would shoot them. After they left, defendant said that they had beaten his cousin and that he "took one of 'em go down and I'm going to get one more."

Sometime after the murder, Tien Thanh Nguyen, Lai, and Thuy Nguyen were at the Giot Dang coffee shop. Bao Huynh, his younger brother Tai, and Long Tran aggressively entered the shop. A melee broke out among the two groups and they argued and threw chairs at each other. The manager told everyone to leave. Although defendant was not present at the fight, after Bao Huynh, his brother Tai and Long Tran left, defendant came in and said to Thuy Nguyen, "one drop, one to go."

About a year and a half after the murder, in June 2001 Le's friend and fellow gang member Voung Nguyen were arrested on warrants for a shooting in San Jose and a burglary in San Diego. Voung Nguyen asked to speak with Asian Gang expert Detective Michael Gallivan. Voung Nguyen admitted to the detective that he had committed violent crimes on behalf of Asian Warriors. He said that when he arrived in San Diego, defendant found him a place to stay with a V-Boy gang member. Defendant visited frequently and became close friends with Voung Nguyen. After he told defendant about a San Jose shooting that he and Le had committed, defendant admitted to Voung Nguyen and Le that he had shot Pham on the freeway after following Pham from a coffee shop to Mira Mesa and back. Defendant told Voung Nguyen he used a .380 caliber firearm and shot at Pham six to eight times.

6

Voung Nguyen said that defendant told him that he committed the shooting in retaliation for the pool hall fight involving his cousins Bao Huynh and Tai Huynh.

*Gang Evidence*

Detective Gallivan testified as an expert on San Diego Asian gangs. He identified Lai, Tien Thanh Nguyen, Thuy Nguyen, Hieu Do, and Dong Nguyen as documented members of the V-Boys criminal street gang. He testified that Le and Voung Nguyen were documented members of the Asian Warriors, a criminal street gang in San Jose.

Gallivan further testified that defendant, Bao Huynh, Tai Huynh, Long Tran, Quan Nguyen and Quy Tran were not documented criminal street gang members, and that Pham also had not been a gang member. In his testimony, Gallivan defined "associate" as a term of art in gang culture, meaning to be involved in criminal activities with gang members as well as spending time with them. He stated that defendant was neither a gang member nor an "associate" of a gang within that meaning of the term. Gallivan had not heard of Thien Dang before this investigation and did not know if it was a gang.

Gallivan explained that in the culture of criminal street gangs, *respect* was of utmost importance, and gang members tended to respond to a disrespectful act with overwhelming, disproportional violence, which was a part of the gangs' code of conduct. He added a gang member would react far more violently than would an ordinary person to an act deemed disrespectful.

DISCUSSION

Defendant contends the trial court prejudicially erred in allowing admission of evidence and argument that defendant was a member and leader of a gang, Thien Dang, to show intent and motive. He asserts that

7

there was no evidence Thien Dang was a criminal street gang or that its members engaged in any criminal activity; and that evidence defendant belonged to a gang, which did not have the culture and habits of a criminal street gang, had no relevance to the issues at trial and therefore, its admission was inflammatory and prejudicial error.

Defendant separately contends the trial court erred in permitting the People to elicit improper expert opinion testimony in response to a hypothetical question that was not based on facts in the record.[4]

A. *Proceedings Below*

1. Prior Appeal

As noted, in *Huynh I* we reversed defendant's conviction because the trial court had excluded information that the V–Boys and Asian Warriors were both criminal street gangs, and that Lai, Thuy Nguyen, Tien Thanh Nguyen, and Do were documented members of V-Boys,[5] and that Voung Nguyen and Le were documented members of the Asian Warriors. We concluded the evidence would tend to show that Pham spent time with the V-Boys and would undercut Voung Nguyen's testimony that defendant confessed to killing a friend of the V-Boys while visiting Voung Nguyen at Do's "crash pad" for V-Boys. (*Huynh I*, *supra*, D067777, at pp. 27–31.)

---

[4] Because we reverse on these issues, we offer no opinion on defendant's other claims of error, including admission of evidence that defendant sold a gun to a gang member, and the court gave a faulty jury instruction.

[5] Dong Nguyen, another documented V-Boy member, did not testify at the first trial. Evidence of defendant's sale of a firearm to Dong Nguyen was excluded at that trial. (See *Huynh I*, *supra*, D067777.)

8

## 2. Pretrial Motions in this Case

On retrial, defense counsel filed a motion in limine requesting that gang evidence about the prosecution witnesses be admitted. In support, he said that "gangs have a code of conduct that focuses on respect and retaliation." Counsel intended to argue that Voung Nguyen and/or Le, both Asian Warrior members, shot Pham in retaliation against the V-boys for the injuries suffered by Le and Bao Nguyen at the pool hall.

Defense counsel also moved to prohibit evidence that defendant was in a gang. Defense counsel asked for an offer of proof and a hearing before admission of any evidence that defendant was a gang member. Defense counsel argued Thien Dang was a drinking club and there was no evidence it was a criminal street gang. The People responded that it was a criminal street gang and defendant was associated with Thien Dang at the time of the murder. The People argued this gang evidence should be admitted to show defendant's motive and intent.

The evidence was proffered to show that defendant associated with gang members, to rebut defendant's evidence that he attended a technical college and spent his time with friends from the college. In ruling to admit the gang evidence, the court stated, "One of the reasons the case was reversed [in *Huynh I*] was because gang evidence should have come in. Both sides agree gang evidence is going to come in and it permeates everything. [¶] . . . [¶] I think that would not be fair if I allow one side to introduce a lot of gang evidence and the other side, I say no, you can't go there. [¶] So what's good for the goose is good for the gander. Both sides can get into gangs . . . . Out of fairness."

9

### 3. Thien Dang

The only evidence that defendant belonged to a gang came from Tien Thanh Nguyen's first police interview on May 31, 2000, with Detective Steven McDonald, a general homicide detective unfamiliar with San Diego Asian gangs. When talking about the pool hall fight, Tien Thanh Nguyen said one of those fighting against him was from San Jose and spent time with an East San Diego group called Thien Dang.[6] Tien Thanh Nguyen said he heard a rumor that local Thien Dang gang members killed Pham. He stated that when he drove to the Giot Dang coffee shop, the "whole gang" was waiting there, including Bao Nguyen and his brother Tai. They surrounded his car, and kicked and dented it. Tien Thanh Nguyen mentioned "a guy" who was the head of the Thien Dang gang, or had authority in the gang, who was not present at the pool hall fight, but who, along with others, had kicked Tien Thanh Nguyen's car in the coffee shop parking lot. Tien Thanh Nguyen said he forgot the man's name but would recognize a photo of him. McDonald however, then had no photos to show Tien Thanh Nguyen.

McDonald testified that six years later, he showed Tien Thanh Nguyen a photo lineup that included defendant. Tien Thanh Nguyen identified defendant as the person at Giot Dang to whom he was referring, saying, "I know him from [the] coffee shop and pool [hall]."

Tien Thanh Nguyen said in his two subsequent interviews and at trial that Thien Dang was not a gang but either a group of Vietnamese men who gathered to drink and socialize or the place where they gathered. Additional

---

[6]    It was the translator, a police community service officer, who first used the word "gang." Tien Thanh Nguyen mentioned a "group called Thien Dang," and said, "[It's] called, like a band, a band." The translator asked, "A gang?" to which Tien Thanh Nguyen responded, "A gang . . . ."

witnesses also testified that Thien Dang was a group of Vietnamese men or the place where they gathered to drink and socialize.

Neither the homicide detective nor the Asian gang expert Detective Gallivan had heard of either defendant or Thien Dang before this investigation.  Gallivan testified that he did not know every gang, however, especially in the Asian communities where the gangs tended to make an effort to be inconspicuous.

### 4.  The Hypothetical Question

Defendant separately complains about a hypothetical question to the People's gang expert that also suggested defendant was a gang member. Defendant contends the following question posed by the prosecutor to gang expert Gallivan was not supported by facts in evidence:

> "Hypothetically, if you had someone who was on the fringe, let's say in the street-gang world hanging out with known gang members, providing weapons to known gang members, or at least a weapon and that person was chased by a machete after he kicked a car from an earlier dispute that had happened where one of his friends was hit over his head and hospitalized for a gash to the back of his head, in a situation where someone is sort of dabbling in the world of gangs or even a gang member, would that, in your experience, provide a motive for murder?"

Defense counsel objected.  The court overruled the objection and Gallivan responded as follows:

> "Well, people in the gang world, depending on what the disrespect is, it could be a shooting, you know, somebody— one gang rolls on another gang and shoots.  That is going to be challenged.  There is going to be another shooting. That's just the way it is.
>
> "There's an instance where a gang member will disrespect another gang member's girlfriend.  That's going to be challenged—there's going to be some type of retaliation.

11

Each one of those types of disrespect is going to have its own level of violence.

"You know when they—one gang will come in, and they'll tag somebody else's territory. If I'm a V-Boy member and I go into Asian Crip territory and I write 'V-Boys' on a school wall or somewhere, they may come back and they may tag your territory. They may do a shooting. It all depends on who's in the leadership role and what their level of violence is.

"I can't sit here and tell you there's an absolute of how somebody's going to challenge somebody, but I think—and based on what I've seen—we've had shootings, as I mentioned just over disrespect of a girlfriend, drive-by shootings. Something like this where you got a fight. A young man gets his head basically split open, scars on his back—back of his head and the top of his head, fights at a cafe where you get chased by a machete and you're getting chased by a gang member who you fought with before, there's going to be a—more than likely, there's going to be some type of violence, and it's probably going to be at a higher level."

5. The Prosecutor Relied on the Gang Evidence in Arguing to the Jury

Consistent with the gang evidence and hypothetical, the prosecutor started and ended his opening statement to the jury with, "Welcome to the world of gangs." He repeated this thematic phrase nine times through his opening statement.

In closing argument, the prosecutor contended that defendant killed Pham in response to being chased by V-Boy members with machetes. The murder, he contended, was consistent with the culture and habit of gang members to respond to a humiliation with overwhelming and deadly force. The prosecutor added, "Thien Dang exists. They may not be the gang that

Tien Thanh [Nguyen] thought it was, but it's a group, they exist, and the defendant is part of it. . . . This is an older group of guys who hang out and commit crime.[7] Sounds a lot like a gang to me."(22 RT 6731)!

The prosecutor continued, "[Defendant's] a killer. He's a killer who likes to provide guns to gang members, who likes to chase down cars when his friend's being beat up and had no problem retaliating a couple days after they disrespected him because that is the world he was living in." The prosecutor in rebuttal concluded by stating, "Welcome to the world of gangs where a young man was taken from us far too early and far too young an age because [defendant] got chased with a machete."

B. *Guiding Principles and Analysis*

Our courts have long recognized the potentially prejudicial effect of gang membership. Our high court has advised that "gang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition' and that such evidence should therefore 'be carefully scrutinized by trial courts.' " (*People v. Mendez* (2019) 7 Cal.5th 680, 691; *People v. Flores* (2020) 9 Cal.5th 371, 402 (*Flores*).) "The risk of injecting undue prejudice is particularly high in cases where the prosecution has not charged a gang enhancement and the probative value of the gang evidence is minimal." (*Flores*, at p. 402; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905 (*Cardenas*).)

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.]' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*).) " 'Gang evidence is relevant and admissible

---

7    There was no evidence that any "members" of Thien Dang committed crimes (separate and apart from the instant case).

when the very reason for the underlying crime, that is the motive, is gang related.  [Citation.]' " (*People v. Memory* (2010) 182 Cal.App.4th 835, 858 (*Memory*).)  Common gang motives include "criminal activity against a rival [citation] or a suspected rival [citation]; a battle over gang territory [citation]; retaliation for a prior attack upon a gang member [citation]; intimidation preceded by gang signs and identification; or bolstering one's reputation within the gang [citation]." (*Id*. at pp. 858–859.)

Gang evidence is inadmissible if introduced only to " ' "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.  [Citations.]" [Citations.]  . . .  Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury.  Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' [Citation.]  'A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion.' [Citation.]" (*Coneal*, *supra*, 41 Cal.App.5th at p. 964.)

Admission of gang evidence not relevant to the facts at trial was found to be reversible error in *Memory*, *supra*, 182 Cal.App.4th at page 859 and in *People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).  We discuss these cases *post* in conjunction with the facts of this case.

Regarding the second claim of error, an expert witness may offer opinion testimony if the subject matter is "sufficiently beyond common experience" such that the expert's opinion "would assist the trier of fact." (Evid. Code, § 801, subd. (a).)  In general, " '[t]he subject matter of the culture and habits of criminal street gangs . . . meets this criterion.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).)  Evidence of the "significance of disrespect in the gang culture" (*Flores*, *supra*, 9 Cal.5th at p. 397) and the "concept of payback within gang culture" (*People v. Martinez* (2003) 113

14

Cal.App.4th 400, 413) have been found relevant to show motive and intent in murders committed for the benefit of a gang.

A gang expert can offer an opinion based on a hypothetical situation if the facts within the hypothetical are supported by the evidence at trial. (*Vang, supra*, 52 Cal.4th at pp. 1045–1046.)

1. Evidence that Defendant Was a Member of Thien Dang

A criminal street gang is an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [enumerated felonies] having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, [two or more enumerated felonies]." (§ 186.22, subds. (e) & (f); *People v. Prunty* (2015) 62 Cal.4th 59, 67.)

Here, there was no evidence that Thien Dang was a criminal street gang; nor was there any evidence that committing crimes was one of its primary activities or that any of its members had committed any crimes, with the exception of defendant's crimes at issue here. Rather, the evidence established that Thien Dang was a place or a group of Vietnamese men who gathered to socialize and drink. Merely because Tien Thanh Nguyen, when prompted by an interpreter, at one point stated Thien Dang was a criminal street gang did not make it so. Yet, throughout the trial Thien Dang was treated as a criminal street gang. And, as noted *ante*, the prosecutor without foundation continually attributed the culture and habits of members of a criminal street gang to defendant.

Moreover, we note no gang allegations were charged here, making the risk of injecting undue prejudice particularly high. (See *Flores, supra*, 9 Cal.5th at p. 402; *Hernandez, supra*, 33 Cal.4th at p. 1049; *Cardenas, supra*,

15

31 Cal.3d at pp. 904–905.) The crimes also bore little indicia of typical gang crimes. (See *Albarran, supra,* 149 Cal.App.4th at p. 227 [gang evidence unduly prejudicial when nothing inherent in crime suggested gang motive].) The fights at the pool hall and at the Giot Dang coffee shop did not include any signs of gang rivalry. Defendant and the group aligned with him—Bao Huynh, Tai Huynh and Long Tran—were not gang members. No gang colors, signs, shouts, or announcements were reported. There was no dispute over territory. Tagging was not mentioned. The victim was not a gang member, although he was friendly with a group of gang members and he was driving a gang member's car on the night of the murder.

The People's gang expert testified to the culture and habit of criminal street gang members to retaliate to acts of disrespect with extreme and disproportional violence for the purpose of showing motive for the murder. We conclude this testimony was irrelevant to defendant because he was neither a member nor associate of a criminal street gang.

As noted, imputing criminal street gang culture to a gang that did not engage in criminal activities was found to be reversible error in *People v. Memory, supra,* 182 Cal.App.4th at page 859. In that case, the defendants belonged to an "outlaw motorcycle club" that was not a criminal street gang. The court allowed the prosecutor great latitude in questioning members of the motorcycle club about affiliations with the Hell's Angels and the club's practices of fighting when challenged, not backing down, and carrying knives. (*Id.* at pp. 852–853.)

The *Memory* court concluded that error occurred because there was no evidence of such club practices. (*Memory, supra,* 182 Cal.App.4th at pp. 852–853.) "Although couched in terms of motive and intent, the People offered evidence of the [motorcycle club] attempting to show [the] defendants had a

16

criminal disposition to fight with deadly force when confronted, but there was no evidence of this disposition. . . . [T]here was no testimony that [the] defendants had a disposition to fight with deadly force when confronted." (*Ibid*.) The *Memory* court reversed the convictions, finding that "the motorcycle gang evidence was particularly inflammatory in showing [the defendants'] propensity for violence" and thus, that a miscarriage of justice resulted. (*Id*. at pp. 864–865.)

Similarly, in *Albarran*, *supra*, 149 Cal.App.4th 214, the defendant was a documented member of a criminal street gang but there was no direct evidence of gang enhancements and nothing inherent in the crimes that suggested any specific gang motive. (*Id*. at p. 227.) The *Albarran* court concluded that the probative value of the gang expert evidence regarding the defendant's possible motive of gaining respect was slim and was outweighed by the prejudice of gang evidence that was extremely inflammatory and had no connection to the crimes (*id*. at pp. 227–228); and that the "paramount function of this evidence was to show [the defendant's] criminal disposition." (*Id*. at p. 228.)

Turning to the instant case, we conclude the trial court erred in treating Thien Dang as equivalent to V-Boys, the latter of which is a recognized criminal street gang. The two groups were not equivalent because there was no evidence that Thien Dang was a criminal street gang. Without the fundamental link of Thien Dang being a criminal street gang, evidence of defendant's membership in Thien Dang was not relevant to his motive or intent. Instead, the evidence was inflammatory by implying to the jury that defendant had a disposition or character for using overwhelming violence in retaliation for disrespect, with no foundational support. (See *Memory*, *supra*, 182 Cal.App.4th at p. 859; *Albarran*, *supra*, 149 Cal.App.4th at p. 223.) We

17

thus conclude the trial court abused its discretion in admitting evidence that defendant was a member and leader of a gang called Thien Dang.

2. Gang Expert Evidence

We conclude the hypothetical posed to the gang expert, summarized *ante*, was improper because the evidence did not support the facts of the hypothetical that defendant was "on the fringe, let's say in the street-gang world hanging out with known gang members, . . . sort of dabbling in the world of gangs or even a gang member." The expert instead unambiguously testified that defendant was neither a gang member nor an associate of a gang. Evidence that defendant was a member of a noncriminal gang did not show that he was on the fringe of criminal street gangs, dabbling in the world of gangs or even a gang member or associate, as the term "gang" was used throughout the trial, i.e. that a "gang" is a criminal street gang.

Defendant knew and spent time with admitted gang members, because gang members and non-gang members socialized together within the Vietnamese community at the coffee shops and pool halls of East San Diego. The gang expert confirmed that gang and non-gang members congregated at these locations. Merely because defendant lived or socialized in an area with gang members and knew or spent time with gang members in his community was insufficient to support the hypothetical fact that he was on the "fringe . . . in the street-gang world" or "dabbl[ed] in the world of gangs."

Defendant's frequent companions—Bao Huynh, Tai Huynh, and Tran Long—were also not gang members. Defendant was friendly with Voung Nguyen, a documented criminal street gang member, but friendship with a criminal street gang member cannot support an inference that defendant committed crimes with him or otherwise acted as a gang member. Similarly, his acquaintance with Do and Dong Nguyen, both V-Boys, did not show that

18

he committed crimes with them or that he shot Pham, a good friend of V-Boy members. The hypothetical did not track the evidence adduced at trial, which showed no connection between defendant and a criminal street gang that would cause defendant to respond to injuries and insults with murder.

Without evidence that defendant committed crimes with Voung Nguyen, Do, and Dong Nguyen, the hypothetical was impermissibly based on guilt by association.[8] "There is no place in our system of justice for the notion of guilt by association or guilt for the acts of others." (*People v. Arredondo* (2018) 21 Cal.App.5th 493, 504; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1062 [guilt by association offends state constitutional principles].)

The expert's response to the hypothetical further supports the finding that the question was not based on the evidence. The expert responded to the hypothetical question by talking about criminal street gang members, not friends of gang members. His answer assumed—as the question implied— that the hypothetical person was a member or associate of a criminal street gang, not that the hypothetical person lived or socialized in an area rife with criminal street gang members. Gallivan had no expertise in people who were friendly with community members who were gang members, but who were not themselves committing crimes or otherwise trying to emulate gang members.

In our view, the habits and culture of young men who socialize widely, including with gang members, is not a matter "beyond common experience [such] that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *Vang, supra,* 52 Cal.4th at p. 1044.) Through years of

---

8    The prosecutor compounded this error in his opening statement, stating "birds of a feather stick together."

investigation, gang experts have learned of specific habits and culture of criminal street gang members that are beyond common experience—such as responding to an insult to a girlfriend with murder. If a defendant is not a member of group that exists for the purpose of committing felonies and whose members have committed felonies, however, an expert cannot opine on the defendant's motive, intent, disposition, or character. The culture and habits of criminal street gang members were not relevant to defendant's motive and intent because defendant did not belong to a criminal street gang, did not have a history of violence, and did not associate with other gang members within the meaning of committing crimes with gang members.

Because Gallivan testified that defendant had no documented association with a criminal street gang, the hypothetical question to the expert was improper and was not supported by the evidence. It was error to permit this question to be posed to the gang expert.

C. *Prejudice*

Evidentiary errors are usually assessed under the state miscarriage-of-justice standard because they do not implicate federal constitutional rights. (*Memory*, *supra*, 182 Cal.App.4th at p. 862; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The *Albarran* court concluded, however, that when there are no permissible inferences the jury can draw from gang evidence, admission of the evidence can be so inflammatory as to violate federal due process. (*Albarran*, *supra*, 149 Cal.App.4th at p. 229; see *People v. Carter* (2003) 30 Cal.4th 1166, 1194 [evidence of defendant's gang membership, although relevant to motive or identity, creates a risk the jury will improperly infer defendant has a criminal disposition and is therefore guilty of the charged offense].)

The *Albarran* court added:  "To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.  'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.'  [Citation.]  'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process."  [Citations.]'  [Citation.]"  (*Albarran, supra,* 149 Cal.App.4th at pp. 229–230.)

Here, when the People's gang expert testified that all Asian gangs were extremely violent, he tagged defendant with the character or disposition for using overwhelming violence in retaliation for disrespectful actions, with no basis in fact.  This was squarely within the legal definition of prejudice:  it is evidence of little evidentiary impact that evokes an emotional bias.  (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)  " 'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]"  (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Disproportionally extreme violence for the humiliation of being chased with a machete was the centerpiece of the People's case against defendant.  Evidence of motive and intent were minimal absent the gang evidence.

Defendant was not involved in the fight at the pool hall.  Being chased by Tien Thanh Nguyen and Thuy Nguyen with machetes might have been humiliating or frightening, but it would not lead the ordinary person to retaliate by murdering Pham.  By all accounts, Pham was present at the machete incident but did not threaten defendant.  And, although Pham was driving Lai's car, Lai was not present at the machete incident.  Motive is not an element of murder, to be sure, but here the opening statement and closing argument of the prosecutor were centered on "the world of gangs" where Pham was murdered "because [defendant] got chased with a machete."  There is an overwhelming likelihood that the jury used evidence of defendant's membership in Thien Dang for an illegitimate purpose.

We conclude the *Albarran* criteria provides meaningful guidance here and supports a finding defendant was deprived of due process of law.  The Attorney General argues that admission of evidence of Thien Dang did not violate due process because "the jury could permissibly infer from the gang evidence that [defendant] was in a gang or immersed in the gang culture and that he shot [Pham] because [Pham] and his gang member friends disrespected [defendant] and his fellow Thien Dang members."  But this is exactly what the jury could not permissibly infer, because there was no evidence that the purpose of Thien Dang was to commit felonies or that members of Thien Dang committed criminal acts.  Nor was there evidence that defendant was a member of or associated with a criminal street gang or wanted to join a criminal street gang.

It was arbitrary and fundamentally unfair to defendant to present evidence that defendant reacted with extreme violence to the machete incident, and that, because he allegedly was a gang member, he had the

motive and intent to shoot Pham in retaliation for being chased with machetes by friends of Pham.

When a defendant has been deprived of federal due process, reversal is required unless the State can prove beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Albarran*, *supra*, 149 Cal.App.4th at p. 229.) Irrelevant, inflammatory evidence that defendant was a gang member contributed to the verdict here. As such, we conclude defendant's murder conviction and the jury's true finding that he personally discharged a firearm during the commission of this offense must be reversed.

In reaching our decision, we are not unaware of the difficulty faced by the trial court in the instant case, as it admitted all the gang evidence as a result of our previous decision in *Huynh I*, where we reversed defendant's conviction because the court had excluded certain gang evidence sought to be admitted by defendant. On remand, instead of an "all" (i.e., the instant case) or "nothing" (i.e., *Huynh I*) approach to the admission of such evidence, the trial court as the gatekeeper of the evidence may appropriately limit the admission of gang evidence as relevant to the issues raised by the parties and in accordance with the dictates of this decision.

## DISPOSITION

The judgment is reversed.

BENKE, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.